Filed 5/2/22  P. v. Walker CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BRANDON CHRISTOPHER WALKER,<br><br>    Defendant and Appellant. | F079399<br><br>(Super. Ct. No. F18907335)<br><br>**OPINION** |

-ooOoo-

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Franson, Acting P. J., Peña, J. and Smith, J.

Appellant Brandon Christopher Walker was charged, in count 1 of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and in count 2 of making criminal threats (Pen. Code, § 422) against victim E.C. He was also charged in count 3 of misdemeanor battery (Pen. Code, § 242) against victim Jose B. As to count 2, the information alleged Walker personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)). It further alleged Walker had served a prior prison term. (Pen. Code, § 667.5, subd. (b).) A jury convicted Walker of all counts and found the weapon use enhancement true.

The trial court struck the prison prior on the People's motion, denied probation, and sentenced Walker to a total of four years in state prison.

On appeal, Walker contends that the trial court prejudicially erred when it excluded evidence of the E.C.'s immigration status, and when it failed to give an unanimity instruction on the criminal threats charge. We find no error and affirm.

## STATEMENT OF THE FACTS

In early October 2018,[1] Jose B. received a call from a neighbor that Walker had been dumping garbage on a vacant lot that Jose B. owned on Teilman Avenue in Fresno. That same day, Jose B. went out to the lot and found Walker on the property. Jose B. told Walker he owned the lot and gave Walker three hours to remove his items. Walker told Jose B. that was not enough time, because he did not have any help to remove the items. When Walker did not remove the items, Jose B. called the police. Jose B. told Walker on two subsequent occasions to remove the items and twice more called the police when Walker refused.

On October 22, Jose B. brought his trailer to the lot to haul away the garbage dumped on his property, as he had received permission from the police to do so. At some point, Walker arrived, angrily yelled at Jose B. not to take his things, and pushed Jose B.

---

[1] All further date references are to the year 2018 unless otherwise stated.

in the chest with both hands. Jose B. walked off the lot and on to the sidewalk, but Walker followed him. Walker then hit Jose B. hard in the eye with his fist. Before Jose B. had a chance to defend himself, Walker punched Jose B. several more times in the face. Jose B. and Walker tried to grab each other's necks and fell to the ground. Walker fell on top of Jose B. and hit him several more times in the face.

E.C. was walking his son home from the bus stop when he witnessed the altercation between Walker and Jose B. After taking his son inside the house, E.C. went back outside. Jose B. was on the ground and Walker was hitting him. E.C. told Walker to get off of Jose B. Walker did and then told E.C., "you're next." A neighbor called the police, who arrived shortly thereafter, but Walker was not arrested at that time.

The following day, October 23, Walker accosted E.C. in front of his house as E.C. went to his car to find some keys. Walker threw his bicycle down and told E.C., "I'll kill you" and pulled a knife from his shorts. As E.C. ran back to his house, Walker pursued him with the knife, which looked like a kitchen knife with a six-inch blade.

Once inside his home, it took E.C. 10 or 15 minutes to calm down before he called the police. Officer Charles Martinez was dispatched at 6:27 p.m. in response to E.C.'s call. E.C., with the help of a Spanish interpreter, provided Officer Martinez with information about a possible suspect.

Later that same evening, Officer Martinez received a call about a suspicious vehicle about 200 yards north of E.C.'s house. When Officer Martinez arrived, he saw an older model truck with three people inside, one of whom was Walker. Walker had a backpack on his lap that was later searched, and a three-inch long pocketknife found inside.

Officer Martinez and his partner Officer Dudley conducted a follow-up investigation by driving from E.C.'s house to an AM/PM on South Cherry Avenue. The distance between the two locations was approximately five miles and took six minutes, primarily via Highway 99.

Walker's mother, Sharon Walker[2], testified for the defense that, on the evening of October 23, Walker called her and asked her to meet him at Little Caesars for pizza. Sharon arrived at Little Caesars at about 6:05 p.m., and Walker arrived about 10 minutes later, via bicycle. According to Sharon, Walker had a truck, but it was impounded five months previously.

After the two ate, Walker took his bike apart and then Sharon dropped Walker off with his bicycle near the Belmont cemetery around 7:15 or 7:30 p.m. Sharon estimated that the Little Caesars restaurant was one or two miles from the AM/PM.

A short AM/PM video surveillance footage, time stamped 6:41, was played for the jury. Sharon identified the man in the video as Walker. Sharon testified that she did not go to the AM/PM, only Little Caesars. The People and defense stipulated that the AM/PM date and timestamp shown on the video were accurate within 30 seconds.

On cross-examination, Sharon admitted that she told a defense investigator that she was not exactly sure when she arrived at the Little Caesars – "6, 6:20, 6:15" – which was 15 minutes from her house.

## DISCUSSION

### I.    E.C.'S IMMIGRATION STATUS

Walker contends that trial court erred in precluding cross-examination of E.C.'s immigration status and prior arrests and deportations, thereby violating his constitutional right to present a defense, due process, and a fair trial. We conclude Walker demonstrates no evidentiary or constitutional error.

*Background*

Prior to trial, the People filed a motion to exclude evidence relating to the immigration status of E.C. and Jose B. The People did not object to the defense's cross-

---

**2**    We will refer to her as Sharon to avoid confusion.

examination of E.C. regarding benefits he might receive through U-Visa.[3]  The People argued that E.C.'s and Jose B.'s prior entries and removals from the country were remote in time (E.C.'s last entry was 13 years prior), and the mere presence in the country without legal authorization did not evidence moral turpitude, and were therefore more prejudicial than probative under Evidence Code section 352.

At the hearing on the motion, the defense stated its intent to impeach E.C. with evidence that he had applied for and received a U-Visa because of his involvement in this case.  The trial court indicated that it would allow such questioning.  The People then clarified that E.C. had received authorization from the police department to apply for the U-Visa and that he was in the process of doing so, but it was not clear if he had actually received it yet.

The following exchange then took place between the trial court and counsel:

"THE COURT: … [T]he immigration status of [E.C.] and [Jose B.], you want to exclude their prior immigration arrests and removals.

"[THE PROSECUTOR]: That's correct.  I do believe that cross-examination as the Court has already ruled about the U-Visa has already been ruled because that is a benefit [E.C.] has been receiving, but I couldn't believe the mere fact of somebody's presence in the United States without legal status would be a basis for impeachment.…

"THE COURT:  Do you want to be heard on that?

"[DEFENSE COUNSEL]:  As far as your Honor, I would like to as far as [E.C.] is obviously applying for a U-Visa and so –

"THE COURT:  Yes, you can cross-examine him on that, but the arrests themselves, no.

"[THE PROSECUTOR]:  Okay.

---

[3]     Congress created the U-Visa for victims of certain qualifying criminal activity and was intended to gain permanent resident status if certified as having been helpful in the investigation and prosecution of certain qualifying crimes.  (*Fonesca-Sanchez v. Gonzalez* (7th Cir. 2007) 484 F.3d 439, 442, fn. 4; 8 C.F.R. § 214.14.)

"[DEFENSE COUNSEL]: I submit."

At trial, on direct examination, the prosecutor asked E.C. if he had applied for a U-Visa. E.C. testified that he was told he could and had, but it had not yet been granted. He testified further that he was only told about the U-Visa after he reported the incident with Walker on October 23. It was his understanding that the U-Visa would make it easier for him to get a job. On cross-examination, defense counsel asked E.C. several questions about the U-Visa, but no new information came from that line of questioning.

*Applicable Law and Analysis*

Although the jury was aware that E.C. became eligible for the U-Visa after accusing Walker of the assault, Walker contends the trial court erred when it did not allow highly probative evidence that E.C. had been twice arrested and once deported for his immigration status. As argued by Walker, there were no witnesses to the events E.C. alleged occurred on October 23, and evidence of the event (Sharon's testimony, the time the officer responded to the 911 call, and the time stamp at the AM/PM) "spoke against" E.C.'s testimony. As such, Walker contends, the jury would have been "more suspicious of [E.C.'s] problematic testimony if the jury fully understood the degree to which [E.C.] would benefit from levying false accusations." We find no abuse of discretion on the part of the trial court.

With respect to [E.C.'s] immigration status, Evidence Code section 351.4, subdivision (a), expressly precluded such information from being disclosed in a criminal proceeding "unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status."[4] The proponent of the proffered testimony has the burden

---

**4**      Evidence Code 351.4 went into effect on May 17, 2018, and provides as follows: "(a) In a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or his or her attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status. [¶] (b) This section does not

6.

of establishing its relevance and the foundational requirements for its admissibility. (*People v. Blacksher* (2011) 52 Cal.4th 769, 819-920; *People v. Morrison* (2004) 34 Cal.4th 698, 724.) It appears that Walker never moved to admit evidence of E.C.'s immigration status or provide the basis for such an admission, and he has therefor forfeited this claim. (*People v. Zaragosa* (2016) 1 Cal.5th 21, 48; Evid. Code, § 354, subd. (a).)

Assuming, arguendo, Walker's objection during the hearing on the motion was adequate and he has not forfeited this claim, we find no prejudicial error on the part of the trial court. "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544.) Although " '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*Id.* at p. 545.)

We review the trial court's rulings on the admission and exclusion of evidence for abuse of discretion under Evidence Code section 352. (*People v. Harrison* (2005) 35 Cal.4th 208, 230.) "On appeal, we will uphold a trial judge's exercise of discretion under [Evidence Code] section 352 unless it was exercised in an arbitrary, capricious, or patently absurd manner." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051.) We examine the court's ruling based on the record before the court at the time of its ruling. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491; *People v. Fruits* (2016) 247 Cal.App.4th

---

do any of the following: [¶] (1) Apply to cases in which a person's immigration status is necessary to prove an element of an offense or an affirmative defense...." (Evid. Code, § 351.4, added by Stats. 2018, ch. 12, § 2.) The statute remained in effect "only until January 1, 2022, and as of that date is repealed." (Evid. Code, § 351.4, subd. (c).)

188, 208.)  " ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion."  [Citation.]'  [Citation.]"  (*People v. Zapien* (1993) 4 Cal.4th 929, 976; see also *People v. Turner* (2010) 10 Cal.5th 786, 807.)

Admissibility of any past misconduct for impeachment is limited by the relevance requirement of moral turpitude.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 296, fn. omitted.)  Our Supreme Court has held that the mere presence of an undocumented immigrant in the United States without lawful authorization "does not itself involve moral turpitude."  (*In re Garcia* (2014) 58 Cal.4th 440, 460.)  And in this case, the evidence before the trial court was that E.C.'s last entry into the United States was 13 years before the trial in this case.  E.C.'s immigration status was therefore both irrelevant and remote in time, and the trial court did not abuse its discretion in excluding the evidence.

Nor did exclusion of E.C.'s immigration status violate Walker's right to confront witnesses against him or present a defense.  While the Confrontation Clause of the Sixth Amendment provides that "the accused shall enjoy the right … to be confronted with the witnesses against him," it guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20, italics omitted.)

"[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation," (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22), and " 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' (*Chambers v. Mississippi* [(1973)] 410 U.S. [284,] 295.] "  (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138-1139.)  Application of ordinary rules of evidence do not impermissibly infringe on an accused's right to present a defense.

(*People v. Westerfield* (2019) 6 Cal.5th 632, 705; *People v. Gurule* (2002) 28 Cal.4th 557, 620.) And while "completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Boyette* (2002) 29 Cal.4th 381, 428.)

Here, the jury heard that E.C. had applied for a U-Visa and believed he would receive some benefit from it. There was no refusal to allow Walker to present a defense, only a rejection of some evidence concerning the defense. (*People v. Boyette, supra,* 29 Cal.4th at p. 428.) We reject Walker's claim to the contrary.

## II.    UNANIMITY INSTRUCTION

Walker also contends that the trial court prejudicially erred when it failed to give a unanimity instruction as to the charge of making a criminal threat. We find no error.

"[C]ases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) A trial court has a sua sponte duty to give a unanimity instruction when " 'there is a risk the jury may divide on two discrete crimes and not agree on any particular crime.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 878.)

" 'The prosecution can make an election by "tying each specific count to specific criminal acts elicited from the victims' testimony"—typically in opening statement and/or closing argument. [Citations.] … [Citation.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' [Citation.]" (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627.)

Here, we find that the prosecution made an election that the jury relied on and was bound by. (*People v. Brugman, supra,* 62 Cal.App.5th at p. 627.) Walker was charged in count 2 with making a criminal threat against E.C. that occurred on or about October 23, 2018. It was further alleged that, during the commission of the criminal threat, Walker

personally used a deadly or dangerous weapon, to wit, a knife. It is not certain whether the jury saw the charging information, and the verdict form did not differentiate the date and victims of the alleged crimes.

Evidence at trial established that two threats occurred, one on October 22 and another on October 23. However, the only evidence that Walker personally used a knife was when he threatened to kill E.C. on October 23; there was no evidence that Walker used a knife during the altercation on October 22.

During closing argument, the prosecutor discussed the elements of criminal threats and the evidence that proved each element. In doing so, he consistently referenced the evidence of appellant's conduct on October 23, when he threatened to kill E.C. while wielding a knife. After discussing the elements of count 1, assault with a deadly weapon, the prosecutor stated, "The other charge, and this is a charge based on the same conduct, the same incident on October 23rd. Criminal threat." And in discussing the evidence relating to the assault with a deadly weapon charge, he referred solely to the conduct that happened on October 23, when Walker pulled out a knife, threatened to kill E.C., and chased him up his driveway. Although the prosecutor did reference the statement Walker made to E.C. during the October 22 incident, he did so only as evidence supporting the intent element of the criminal threats charge.

Because the record established that the People elected to rely on Walker's threat to kill E.C. during the October 23 incident as the conduct underlying the criminal threat conviction, the trial court had no sua sponte duty to give an unanimity instruction.

**DISPOSITION**

The judgment is affirmed.

10.